STULL, BEVERLIN, NICOLAY & HAAS, LLC
P.O. Box 345
Pratt, Kansas 67124
(620) 672-9446 (phone)
(620) 672-3228 (fax)
lawoffice@stull-law.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SourceRock Energy Partners, LP; | ) | |
| Goldstone Energy, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. |
| Redhawk Advisors, LLC; | ) | |
| Elk Energy Holdings, LLC; and | ) | |
| Thomas C. Knowles; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **COMPLAINT**

COME NOW the Plaintiffs, SourceRock Energy Partners, LP, and Goldstone Energy, LLC, by and through counsel Stull, Beverlin, Nicolay, & Haas, LLC, and for its Complaint against Redhawk Advisors, LLC, Elk Energy Holdings, LLC, and Thomas C. Knowles, and states and alleges as follows:

### PARTIES

1.      Plaintiff SourceRock Energy Partners, LP ("SourceRock") is a Delaware limited partnership with its principal place of business located in the State of Colorado.

2.      Plaintiff Goldstone Energy, LLC ("Goldstone") is a Delaware limited liability company with its principal place of business located in the State of Colorado. Plaintiff Goldstone

is a successor in interest to Plaintiff SourceRock insofar as it relates to the oil and gas leases at issue in this Complaint.

3.      Redhawk Advisors, LLC ("Redhawk") is believed to be a Kansas limited liability company formed March 9, 2011 and forfeited the following year. Redhawk's Resident Agent is United States Corporation Agents, Inc., 4701 College Blvd., Suite 110, Leawood, Kansas 66211]. However, correspondence provided by Defendant Thomas C. Knowles alleges that he is the CEO of Redhawk, with an address of 2250 N. Rock Rd., Suite 118-107, Wichita, KS 67226 (see Exhibit A attached hereto).

4.      Elk Energy Holdings, LLC ("Elk Energy") is a Montana limited liability company registered to do business in the State of Kansas and can be served through its resident agent, Defendant Thomas C. Knowles at 2250 N. Rock Road, Suite 118-107, Wichita, Kansas 67226.

5.      Upon information and belief of Plaintiff, Defendant Elk Energy is a related and affiliated company of Defendant Redhawk with Defendant Thomas C. Knowles acting as principal and agent of both Elk Energy and Redhawk

6.      Thomas C. Knowles ("Knowles") is a resident of the State of Kansas and can be served with process at his personal residence at 2256 N. Tallgrass St., Wichita, KS 67226.

JURISDICTION AND VENUE

7.      This Court has personal jurisdiction over all the parties as they availed themselves of such jurisdiction by registering to do business or actually conducting business in the State of Kansas.

8.      This Court has subject matter jurisdiction over all the claims asserted in this Complaint pursuant to 28 U.S.C. §1332(a) as complete diversity exists between the parties and the amount in controversy exceeds the sum of $75,000.00.

2

9.      Venue is proper in this Court as this matter concerns the operation and development of an oil and gas lease situated in Sumner County, Kansas and the business conducted by the Parties at issue occurred in the State of Kansas.

<u>FACTS OPERATIVE TO ALL CLAIMS</u>

10.     On or around October 5, 2016, Defendant Redhawk through its representative, Defendant Thomas C. Knowles, offered to sell Plaintiff Source Rock a 50% working interest in the Buresh Project situated in in Sumner County, Kansas, which was accepted by Plaintiff Source Rock.

11.     This agreement was memorialized in a letter executed by Plaintiff Source Rock and Defendant Thomas C. Knowles as CEO of Defendant Redhawk dated October 5, 2016. A true and correct copy of the executed agreement between Plaintiff Source Rock and Defendant Redhawk is attached as Exhibit A (hereinafter "<u>Purchase Agreement</u>").

12.     The Purchase Agreement states that Plaintiff Source Rock "shall acquire 50% Working Interest . . . in the [Buresh Project]" and that the "turn-key costs . . . for [Plaintiff]" are $500,00.00 broken down as follows:

- Lease Cost - $64,000 (50%)

- Completion of [saltwater disposal well] - $240,000 (50%)

- Recompletion of Buresh Wellbore $196,000 (50%)

13.     Pursuant to the terms of the Purchase Agreement, Plaintiff Source Rock tendered $500,000.00 to Defendant Redhawk for an agreed upon 50% working interest in the Buresh Project.

14.     On October 11, 2016 and six days after Plaintiff Source Rock and Defendant Redhawk entered into the Purchase Agreement, affiliated Defendant Elk Energy entered into an

oil and gas lease with James A. and Vonette Buresh for one (1) year primary term on the North Half (N/2) of Section Seventeen (17), Township Thirty-four (34) South, Range Three (03) West, Sumner County Kansas ("Buresh Lease"). A true and correct copy of the Buresh Lease is attached hereto as Exhibit B.

15.     At the time of its execution, the Buresh Lease had a single unplugged wellbore – the Buresh 17-1HM, API 15-191-22715-0100 ("Buresh Well").

16.     At or around the same time as securing the Buresh Lease, Defendant Elk Energy entered into an oil and gas lease with the Veda Dvorak Trust for a one (1) year primary term on the East Half (E/2) of Section Eight (8), Township Thirty-four (34) South, Range Three (03) West, Sumner County Kansas ("Dvorak Lease"). A true and correct copy of the Dvorak Lease is attached hereto as Exhibit C. The Dvorak Lease is situated immediately north of the Buresh Lease.

17.     The Buresh and Dvorak Leases both provide that "[n]o well shall be used as a salt water disposal well without [Lessors'] prior written consent."

18.     Subsequent to Plaintiff Source Rock fully performing under the Purchase Agreement, Plaintiff and Defendant Redhawk entered into a second agreement for Plaintiff Source Rock to purchase an additional 25% working interest in the Buresh Project for $250,000.00. Plaintiff Source Rock timely paid all but $81,000.00 under this subsequent agreement for its purchase of the additional 25%.

19.     Upon information and belief of Plaintiffs, Defendant Elk Energy has been the sole and exclusive operator of Buresh and Dvorak Leases.

20.     On August 29, 2018, Defendant Knowles, as CEO of Defendant Elk Energy, executed an Affidavit of Production stating that the Buresh Well has been completed on the Buresh

Lease and is "capable of producing oil and/or gas in paying quantities." A copy of this Affidavit of Production is attached hereto as Exhibit D.

21.     In February 2021, Buresh and Dvorak Leases were unitized to create the Buresh 17-1HM Unit ("Buresh Unit").

22.     Upon information and belief of Plaintiffs, the "Buresh Project" and "Buresh wellbore" referenced in the Purchase Agreement are the aforementioned Buresh Unit and the Buresh Well, respectively.

23.     In April 2021 and more than four years after entering into Purchase Agreement with Plaintiff, Defendant Elk Energy entered into a saltwater disposal agreement with the Veda Dvorak Trust on the ground covered by the Dvorak Lease ("Dvorak SWD Lease"). A copy of the Dvorak SWD Lease is attached hereto as Exhibit E.

24.     Defendant Elk Energy allegedly drilled and completed a saltwater disposal well for the Buresh Project ("Dvorak SWD") on or around September 13, 2021, almost five years after Plaintiff Source Rock entered into the Purchase Agreement and tendered its consideration for drilling and completing a saltwater disposal well for the Buresh Project.

25.     On September 22, 2021, Defendant Elk Energy provided Plaintiffs with a written status report for the Buresh Unit ("Status Report"). A copy of the Status Report is attached hereto as Exhibit F.

26.     The Status Report reflects that the Dvorak SWD has been completed and the Buresh Well has been connected to the Dvorak SWD system. However, the Status Report indicates that significant mechanical and engineering issues remain to be addressed before the Buresh Unit can commence commercial operations.

27.     The Status Report further indicates that the Buresh Unit is capable of producing commercial quantities of oil and gas, but will require having to flare off several hundred MCF a day in order to operate the well due to a lack of gas pipeline. Elk Energy does not currently have a pipeline connection or easements necessary to construct a pipeline despite having "operated" the Buresh and Dvorak Leases for more than five years.

28.     The Status Report does not indicate whether the Buresh Well has been recompleted and Plaintiff has no independent knowledge of whether any Defendant has attempted recompletion of the Buresh Well.

29.     Neither Plaintiff has received any income from the production of the Buresh Unit since entering into the Purchase Agreement.

30.     Upon information and belief of Plaintiffs, the Buresh Unit is currently inoperable and has been inoperable since Plaintiff Source Rock tendered $669,000.00 as its working interest payment for turn-key costs.

31.     Although Plaintiff Source Rock has tendered its full consideration pursuant to the terms of the Purchase Agreement, neither Plaintiff has received an assignment of working interest in the Buresh Lease and/or Buresh Unit.

32.     All conditions precedent to filing this lawsuit have been met including required notices and demands to Defendant Redhawk and Defendant Elk Energy.

<u>COUNT I – DEMAND FOR ACCOUNTING</u>
<u>(DEFENDANTS REDHAWK AND ELK ENERGY)</u>

33.     Plaintiffs incorporates by reference Paragraphs 1 through 32 herein as Paragraph 34.

34.     In total, Plaintiff Source Rock has tendered $669,000.00 to Defendant Redhawk for Plaintiffs' portion of the "turn-key" costs to acquiring the Buresh and Dvorak Leases, drill a saltwater disposal well for the Buresh Project, and recomplete the Buresh Well.

35.     Since Plaintiff Source Rock purchased its interest in the Buresh Project and first tendered its consideration to Defendant Redhawk in 2016, Defendants Redhawk and Elk Energy have failed to adequately apprise Plaintiffs on the status of the Buresh Project.

36.     Plaintiffs have made repeated demands of all Defendants Redhawk and Elk Energy for an accounting of expenditures related to the Buresh Project.

37.     To date, Defendants Redhawk and Elk Energy have failed and wholly refused to furnish an accounting that accurately reflects all expenditures related to the Buresh Project and the status Plaintiffs' investment.

38.     As a co-venturer with Defendants Redhawk and Elk Energy, Plaintiffs are entitled to know when, how and where funds are being used in furtherance of the parties' mutual goals of developing the Buresh Project.

39.     Defendants Redhawk and Elk Energy have no basis, legal or otherwise, to refuse disclosure or otherwise conceal the expenditures made in furtherance of the Buresh Project.

WHEREFORE, Plaintiffs requests an order from this Court that the Defendants Redhawk and Elk Energy timely furnish an accounting of all expenditures related to the Buresh Project and an accounting of all payments tendered by Plaintiffs, and for all such further relief the Court deems just and equitable.

## COUNT II –BREACH OF CONTRACT (DEFENDANT REDHAWK)

40.     Plaintiffs incorporate by reference Paragraphs 1 through 39 herein as Paragraph 40.

41.     Plaintiff Source Rock and Defendant Redhawk first entered into a valid "turn-key" contract in 2016 for the joint acquisition of the Buresh Unit leases, completion a saltwater disposal well thereon, and recompletion of the Buresh Well.

42.     To date, Plaintiff Source Rock has tendered $669,000.00 for its interest in the Buresh Unit.

43.     Defendant Redhawk has failed to execute and deliver to either Plaintiff an assignment of interest in the Buresh Unit leases, and Defendants Redhawk has failed to recomplete the Buresh Well.

44.     Defendant Redhawk's failure to perform its contractual obligations pursuant to the express terms of the Purchase Agreement is an explicit breach of its contract with Plaintiffs.s

45.     Defendant Redhawk's breach of contract has caused Plaintiffs damage in excess of $75,000.00.

WHEREFORE, Plaintiff sprays the Court determine that Plaintiffs and Defendant Redhawk entered into a valid and enforceable contract; that Defendant Redhawk has breached this contract by failing to assign Plaintiffs' purchased interests in the Buresh Unit lease, and Defendant Redhawk's failure to recomplete the Buresh Well as specified by the Purchase Agreement; that as a result of Defendant Redhawk's breaches, Plaintiff has been damaged in excess of $75,000.00; and for all such further relief that is deemed just and proper.

<u>COUNT III –BREACH OF DUTY TO ACT AS PRUDENT OPERATOR<br>(DEFENDANT ELK ENERGY)</u>

46.     Plaintiffs incorporate by reference Paragraphs 1 through 45 herein as Paragraph 46.

47.     Defendant Elk Energy secured the Buresh and Dvorak Leases approximately five years ago. These leases were for a one-year primary term and expressly prohibited a saltwater disposal well to be drilled on the property covered by the leases.

48.     To date no ratification or extension of either the Buresh or Dvorak Lease has been filed of record with the Sumner County Register of Deeds.

49.     More than three years after Defendant Knowles filed the Affidavit of Production alleging the Buresh well is "capable of producing oil and/or gas in paying quantities," Defendant Elk Energy completed the Dvorak SWD necessary for operating the Buresh Unit.

50.     Plaintiffs are without any knowledge or information as to whether Defendant Elk Energy has recompleted or attempted to recomplete the Buresh Well.

51.     Defendant Elk Energy's Status Report indicates that the Buresh Unit still suffers from significant mechanical and engineering problems that must be remedied prior to commencing commercial operations. It is evident from the Status Report that the mechanical and engineering problems were not discovered by Defendant Elk Energy until after it completed the Dvorak SWD system.

52.     The Status Report reflects that the Buresh Unit produces a significant amount of natural gas, and to date Defendant Elk Energy has no means of addressing the natural gas production other than to flare off several hundred MCF a day. At current market rates, this could amount to upwards of $1000.00 in gas flared off daily assuming said flaring is allowed by the Kansas Corporation Commission.

53.     Although Defendant Knowles 2018 Affidavit of Production affirmatively alleges the Buresh Unit is capable of producing oil and gas in commercial quantities, Defendant Elk Energy has failed to bring the Buresh Unit into commercial production after more than five years and has failed to act as a prudent operator through diligent development of the Buresh Unit.

54.     Defendant Elk Energy's breach of the covenant to act as a prudent operator has damaged Plaintiff in excess of $75,000.00.

9

WHEREFORE, Plaintiff prays the Court determine that Defendant Elk Energy has failed to diligent pursue development of the Buresh Unit and has breached its covenant to act as a prudent operator of the Buresh Unit; that Plaintiff has suffered damages in excess of $75,000.00 as a result of Defendants Elk Energy's breach of said covenant; and for all such further relief that is deemed just and proper.

COUNT IV - NEGLIGENT MISREPRESENTATION
(DEFENDANTS REDHAWK AND KNOWLES)

55.     Plaintiffs incorporates by reference Paragraphs 1 through 54 herein as Paragraph 55.

56.     Defendant Redhawk, by and through its CEO and agent Defendant Knowles, presented Plaintiff Source Rocke with the Purchase Agreement wherein Defendant Redhawk indicated it would acquire a lease for the Buresh Project, immediately drill and complete a saltwater disposal well, recomplete the Buresh Well, and assign Plaintiff Source Rock its interest in the Buresh Unit leases.

57.     At the time Defendants Redhawk and Knowles presented Plaintiff Source Rock with the Purchase Agreement, there was no valid or existing oil and gas lease on the Buresh Project property.

58.     Defendants Redhawk and Knowles specifically represented to Plaintiff Source Rock it would be able to acquire an oil and gas lease on the Buresh Project property that allowed for immediate drilling and completion of a saltwater disposal well.

59.     Defendants Redhawk and Knowles further represented to Plaintiff Source Rock that it would cost $480,000.00 to drill and complete a saltwater disposal well for servicing the Buresh Project.

60.     Pursuant to the terms of the Purchase Agreement, Plaintiff has tendered $669,000.00 for its interest in the Buresh Unit leases.

61.     Despite Plaintiff Source Rock's agreement being with Defendant Redhawk, affiliated Defendant Elk Energy ultimately obtained the Buresh and Dvorak Leases and created the Buresh Unit.

62.     Both the Buresh and Dvorak Leases granted to affiliated Defendant Elk Energy specifically prohibit drilling of a saltwater disposal well.

63.     By representing that Defendant Redhawk would be acquiring a lease for the Buresh Project to drill a saltwater disposal well and recomplete the Buresh Well, Defendants Redhawk and Knowles failed to exercise reasonable care and misrepresented to Plaintiff Defendant Redhawk's ability to acquire the lease contemplated by the Purchase Agreement.

64.     Plaintiff Source Rock relied on Defendants Redhawk and Knowles's misrepresentation of material facts when agreeing to purchase its interest in the Buresh Project.

65.     Defendants Redhawk and Knowles's misrepresentation was supplied directly to Plaintiff for the benefit and guidance of Plaintiff Source Rock prior to entering into the Purchase Agreement.

66.     Defendants Redhawk and Knowles's misrepresentation intended to influence Plaintiff Source Rock into entering into the Purchase Agreement, and Plaintiff has suffered damages in excess of $75,000.00 as a result of Defendants Redhawk and Knowles's misrepresentation.

WHEREFORE, Plaintiffs prays the Court determine that Defendants Redhawk and Knowles negligently misrepresented material facts to Plaintiff Source Rock; that said misrepresentations were intended to and in fact did influence Plaintiff Source Rock into entering

into the Purchase Agreement; that Plaintiff Source Rock has suffered damages in excess of $75,000.00 as a result of Defendants Redhawk and Knowles's negligent misrepresentations; and for all such further relief that is deemed just and proper.

### ALTERNATIVE COUNT V - CONVERSION
### (DEFENDANTS REDHAWK AND ELK ENERGY)

67.     Plaintiffs incorporate by reference Paragraphs 1 through 66 herein as Paragraph 67.

68.     Pursuant to the terms of the Purchase Agreement, Plaintiff Source Rock has tendered $669,000.00 to Defendant Redhawk for an agreed interest in the Buresh Project. The funds tendered by Plaintiff Source Rock were explicitly outlined in the Purchase Agreement to be used by Defendant Redhawk to acquire a lease for the Buresh Project and to immediately commence recompleting the Buresh Well and drilling a saltwater disposal well.

69.     Despite the explicit agreement of Plaintiff Source Rock and Defendant Redhawk, affiliated Defendant Elk Energy procured the Buresh Lease which expressly prohibits drilling a saltwater disposal well.

70.     Upon information and belief, part of Plaintiff's $669,000.00 was used to procure the Buresh Lease by Defendant Elk Energy.

71.     To date, neither Defendant Redhawk for Neither Defendant Redhawk nor affiliated Defendant Elk Energy have recompleted the Buresh Well despite still possessing Plaintiff's $669,000.00.

72.     Likewise, to date, neither Defendant Redhawk nor affiliated Defendant Elk Energy have assigned either Plaintiff a working interest in the Buresh Lease despite still possessing Plaintiff's $669,000.00.

73.    Plaintiffs have demanded Defendant Redhawk and affiliated Defendant Elk Energy return of Plaintiffs' money for failure to perform under the Purchase Agreement. Both Defendants have refused to return Plaintiffs' money.

74.    Defendant Redhawk and affiliated Defendant Elk Energy's use of Plaintiffs' proceeds to acquire the Buresh Lease, with its explicit prohibition of drilling a saltwater disposal well, is the unauthorized exercise of the right of ownership of Plaintiff funds to the exclusion of Plaintiff.

75.    Furthermore, Defendant Redhawk and affiliated Defendant Elk Energy's refusal to return Plaintiffs' funds after having failed to perform under the Purchase Agreement is an unauthorized exercise of the right of ownership of Plaintiff's funds to the exclusion of Plaintiff.

76.    Defendant Redhawk and affiliated Defendant Elk Energy's conversion of Plaintiff's funds have caused Plaintiff damage in excess of $75,000.00.

77.    Defendant Elk Energy has also been flaring off a significant amount of natural gas from the Buresh Well which Plaintiffs believe could amount to more than $1000.00 per day. As working interest owners in the Buresh Unit, Plaintiffs have an interest in this gas to recoup investment and pay operating expenses. Given the amount of time that has passed, Defendant Elk Energy's failure to capture this gas and bring it to market is a wrongful act inconsistent with the Plaintiffs' rights in this gas which has caused them damage.

WHEREFORE, Plaintiffs pray the Court determine that Defendant Redhawk and Defendant Elk Energy have converted Plaintiffs' $669,000.00; that as a result of Defendants' conversion, Plaintiff has been damaged in excess of $75,000.00; that Defendant Elk Energy's has converted Plaintiffs' interest in produced gas by intentional flaring and Plaintiff has been damaged in excess of $75,000.00; and for all such further relief that is deemed just and proper.

Respectfully submitted,

STULL, BEVERLIN, NICOLAY & HAAS, LLC


/s/Josh V.C. Nicolay
Josh V.C. Nicolay #25119
John D. Beverlin II, #23756
420 S. Jackson, Ste. 100
Pratt, Kansas 67124
(620) 672-9446 (phone)
(620) 672-3228 (fax)
joshn@stull-law.com
*Attorneys for Plaintiffs*
*Source Rock Energy Partners, LP and*
*Goldstone Energy, LLC*

## VERIFICATION

STATE OF __Colorado__        )
                             ) ss:
COUNTY OF __Denver__         )

Jason A. Gilbert, being duly sworn upon oath, states and alleges as follows:

That he is the general partner of Source Rock Energy Partners, LP; he has reviewed the foregoing Petition; that he knows and understands the contents of the foregoing Petition, and that the facts, statements and allegations therein contained are true and correct to the best of his knowledge.

_____
Jason A. Gilbert

Subscribed and sworn to before me this 14 day of ~~November,~~ December 2021.

JOSHUA ALEXANDER MEANS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20214033887
MY COMMISSION EXPIRES AUGUST 25, 2025

_____
Notary Public

15



*copy*

SourceRock Energy Partners, LP
J.A. Gilbert, CEO                    October 5, 2016
1925 South Rosemary
Denver, CO  80231

RE:    Buresh Project,
       Sumner County, Kansas

Gentlemen,

This letter shall serve as the agreement between the parties herein and shall replace any and all
agreements prior to the above date made orally or written regarding the above project.
SourceRock Energy Partners, LP shall acquire 50% Working Interest (37.5% NRI) in the above Project,
subject to the lease terms and conditions, herein known as the "Buresh Project" in Sumner County,
Kansas.

The estimated turn-key costs with the Leasing, Drilling and Completion of said Project, "to the tanks",
for SourceRock Energy Partners, LP shall be as follows;

        LEASE COST: $200 per acre to Goldstone Energy, LLC      $  64,000 (50%)
        COMPLETION OF SWD:    5200'                             $240,000 (50%)
        RECOMPLETION OF BURESH WELLBORE                         $196,000 (50%)
        COST to SOURCEROCK ENERGY PARTNERS, LP                       *$500,000

SourceRock Energy Partners, LP agrees to acquire the right to participate for 50% WI with a (37.5 % NRI),
in the BURESH PROJECT, provided funds are received by RedHawk in the amount of $64,000 as a Deposit
for (50% WI, 37.5% NRI), the Deposit must be received by October 5, 2016, if not, SourceRock Energy
Partners, LP, shall not earn any interest in the "BURESH PROJECT" Sumner County, Kansas.

• DRILLING AND COMPLETION OF SWD WELL, BURESH WELLBORE COMPLETION,
  Funds to be paid in increments of (2), 11/01/16 *$145,333,* 12/15/16 *$290,666* = *$435,999*

AGREED AND ACCEPTED THIS 5th DAY OF OCTOBER 2016,

SOURCEROCK ENERGY PARTNERS, LP                    REDHAWK ADVISORS, LLC

J.A. Gilbert, CEO                                 Thomas C. Knowles, CEO

                    2250 North Rock Road, Suite 118-107
                           Wichita, Kansas 67226
                           cknowles@riveroil.com
                              713 398 0903



EXHIBIT

A

BOOK 0988 PAGE 0128

State of Kansas, Sumner County SS:
Filed for record on the 13 Day of
October , 20 16 A.D. at 10:00
o'clock A M and recorded in photo
Book 988 at page 128
fees $81.00
By Tammy Deputy
Jessica D. Anderson

INDEXED
DIRECT
INDIRECT
PHOTO
COMPARED WITH
COPY

| | |
|---|---|
| **LESSOR** | James A and Vonette Buresh (Husband and Wife) |
| **LESSEE** | Elk Energy Holdings LLC |
| **TYPE OF DOCUMENT** | Oil and Gas Lease |
| **RECORDING FEES** | $81.00 |
| **TOTAL AMOUNT** | $81.00 |
| **RETURN ADDRESS** | Elk Energy Holdings LLC |
| | 2250 N Rock Rd 118  Box 107 |
| | Wichita, KS 67226 |

BOOK 0988 PAGE 0128


EXHIBIT
B

Oil Gas and Mineral Lease

BOOK 0988 PAGE 0129

AGREEMENT, Made and entered into the day of October 11, 2016, by and between, __James A. and Vonette Buresh (Husband and Wife)__, whose mailing address is 7124 N. Douglas Lane, North Richland Hills, TX 76182, hereinafter called Lessor(s) (whether one or more), and __ELK ENERGY HOLDINGS, LLC.__, whose address is, 2250 N Rock Rd. 118-107, Wichita, Kansas 67226, hereinafter called Lessee:

Lessor, in consideration of **** *Ten and More* **** Dollars ($10.00) in hand paid, receipt of which is here acknowledged and of the royalties herein provided and of the agreements of the lessee herein contained, hereby grants, leases and lets exclusively unto lessee for the purpose of investigating, exploring by geophysical and other means, prospecting drilling, mining and operating for and producing oil, liquid hydrocarbons, all gases, and their respective constituent products, injecting gas, water, other fluids, and air into subsurface strata, laying pipe lines, storing oil, building tanks, power stations, telephone lines, and other structures and things thereon to produce , save, take care of, treat, manufacture, process, store and transport said oil, liquid hydrocarbons, gases and their respective constituent products and other products manufactured therefrom, and housing and otherwise caring for its employees, the following described land, together with any reversionary rights and after-acquired interest, therein situated in SUMNER County, State of KANSAS described as follows to-wit:

### N2, Section 17, Township 34 South, Range 03 West

Containing 320.00 acres, more or less, and all accretions thereto.

### See Exhibit "A" Additional Provisions

Subject to the provisions herein contained, this lease shall remain in force for a term of ONE (1) year from this date (called "primary term"), and as long thereafter as oil, liquid hydrocarbons, gas or other respective constituent products, or any of them, is produced from said land or land which said land is pooled.

In consideration of the premises the said lessee covenants and agrees:

1st. To deliver to the credit of the lessor, free of cost at the wellhead, and in the pipeline to which lessee may connect wells on said land, the equal (20%) part of all oil produced and saved from and on the leased premises.



2nd. To pay lessor for gas of whatsoever nature or kind produced and sold, or used off the premises, or used in the manufacture of any products there from,(30%), at the market price at the well, (but, as to gas sold by lessee, in no event more than (20%) of the proceeds received by lessee from said sales), for the gas sold, used off the premises, or in the manufacture of products there from, said payments to be made monthly. Where gas from a well producing gas only is not sold or used, lessee may pay or tender as royalty Twelve Dollars ($12.00) per year per net mineral acre retained hereunder, for a period of TWO (2) years, and if such payment or tender is made it will be considered that gas is being produced within the meaning of the preceding paragraph.

This lease may be maintained during the primary term hereof without further payment or drilling operations. If lessee shall commence to drill a well within the term of this lease or any extension thereof, the lessee shall have the right to drill such well to completion with reasonable diligence and dispatch, and if oil or gas, or either of them, be found paying quantities, this lease shall continue and be in force with like effect as if such well had been completed within the term of years first mentioned.

If said lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties herein provided for shall be paid the said lessor only in the proportion which the lessor's interest bears to the whole and undivided fee.

Lessee shall have the right to use, free of cost, gas, oil and water produced on said land for lessee's operations thereon, except water from the wells of lessor.

When requested by lessor, lessee shall bury lessee's pipe lines below plow depth.

No well shall be drilled nearer than 200 feet to the house or barn now on said premises without written consent of lessor.

Lessee shall pay for damages caused by lessee's operations to growing crops on said land.

Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing.

If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns, but no change in the ownership of the land or assignment of rentals or royalties shall be binding on the lessee until after the lessee has been furnished with a written transfer or assignment or a true copy thereof. In case lessee assigns this lease, in whole or in part, lessee shall be relieved of all obligations with respect to the assigned portions or portions arising subsequently to the date of assignment.

Lessee may at any time execute and deliver to lessor or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered.

All express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules or Regulations, and this lease shall not be terminated, in whole or in part, nor lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any such Law, Order, Rule or Regulation.

Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof with other land, lease or leases in the immediate vicinity thereof, when in lessee's judgment it is necessary or advisable to do so in order to properly develop and operate said lease premises so as to promote the conservation of oil, gas or other minerals in and under and that may be produced

BOOK 0988 PAGE 0129

BOOK 0988 PAGE 0130

from said premises, such pooling to be of tracts contiguous to one another and to be into a unit or units not exceeding 160 acres each in the event of an oil well, or into a unit or units not exceeding 640 acres each in the event of a gas well. Lessee shall execute in writing and record in the conveyance records of the county in which the land herein leased is situated an instrument identifying and describing the pooled acreage. The entire acreage so pooled into a tract or unit shall be treated, for all purposes except the payment of royalties on production from the pooled unit, as if it were included in this lease. If production is found on the pooled acreage, it shall be treated as if production is had from this lease, whether the well or wells be located on the premises covered by this lease or not. In lieu of the royalties elsewhere herein specified, lessor shall receive on production from a unit so pooled only such portion of the royalty stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein on an acreage basis bears to the total acreage so pooled in the particular unit involved.

Lessor hereby agrees to arrant and defend title to all lands and minerals, in and to same, in the event the minerals are not as represented by Lessor, the Lessor agrees to refund the bonus and rental or option monies paid by Lessee or its assigns, for the represented ownership by Lessor, upon demand. Should the legal description of the lands herein need to be corrected for any reason, Lessor(s) hereby grant(s) unto Lessee the authority to do so, then so notifying Lessor of the changes, which may or may not affect the Lease money paid herewith.

IN WITNESS WHEREOF, the undersigned executed this instrument as of the day and year first above written, *This document may be executed in counterparts.*

Witnesses:

James A. Buresh

Vonette Buresh

STATE OF _Texas_

COUNTY OF _Tarrant_                                    ACKNOWLEDGEMENT FOR INDIVIDUALS

The foregoing instrument was acknowledged before me this _11th_ day of _October_ , 2016,

By _James A Buresh_                       and _Vonette Buresh_

_Husband and Wife_

My Commission expires _10/19/2019_                         Notary Public

STATE OF_____

COUNTY OF_____                               ACKNOWLEDGEMENT FOR INDIVIDUALS

The foregoing instrument was acknowledged before me this _____ day of _____ , 2016,

By_____ and _____

My Commission expires_____        Notary Public

BOOK 0988 PAGE 0130

BOOK 0988 PAGE 0131

Exhibit "A"

Attachment to Oil, Gas, and Mineral lease

ADDITIONAL PROVISIONS

1. Lessee agrees to pay to the Lessor minimum damages of $6,000.00 per well site location for vertical well, or $12,000.00 per horizontal well drilled per site location with one well bore per sight and $3,000.00 per additional well bore which shall be paid in advance of any work on location. Well site shall not exceed 2 (two) acres for vertical well or 3 (three) acres for horizontal well.

2. It is agreed between the Lessor and Lessee that notwithstanding any language herein, or in any division order to the contrary, all oil, gas, natural gas liquids, or other royalty accruing at the well head, "mouth of the well", to the Lessor under this lease or by state law shall be **without deduction** of all post production costs between well head and point of delivery of sale and for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas, gas liquids and other products produced hereunder to transform the product into marketable form. In no event shall Lessor receive a "market value" price that is less than, or more than, the price received by Lessee... as to all gas sold by Lessee under a written contract, the price received by Lessee for gas shall conclusively presumed to be the net proceeds at the well... for gas so sold. Lessor shall receive royalty share of any gas flared after ~~fifteen~~ (30) days accumulated production with price based on average daily market price for the month in which flaring takes place.

3. Lessee shall be required to keep the top-soil separate from the sub-soil and return the same as top-soil when the pits are leveled.  Lessee further agrees that after drilling operations have been completed, Lessee will fill and level pits within a reasonable time after such pits have dried and cured.  Prior to filling any pits containing a plastic liner, the liner will be removed or destroyed to such an extent that it will not interfere with the cultivation or the free penetration of water.  Existing pit shall be filled and leveled within 90 days of lease signing, *unless being used by lease.* Drill sight will be reduced to minimum required for production operations after completion.  Sight will not be used for storage of nonproduction equipment or buildings, or for any purpose other than oil or gas production.  Trash and debris will be removed within 24 hours from location upon completion of any activities on site.

4. Lessee will keep weeds and noxious weeds free and clear around production equipment and keep weeds free and clear from pumping units and tank batteries and if located in pasture-land will fence the area around such equipment and use cattle guards rather than gates.  All anchors used in drilling and work over rigs are to be marked plainly with T-posts and reflective covers so as to be visible when working the land.  Lessee will correct any breech of this condition within a week of notification by Lessor.

BOOK 0988 PAGE 0131

BOOK 0988 PAGE 0132

5. If Lessee crosses any terrace or fence, Lessee shall restore such terrace or fence to its original condition, as nearly as practical, and during the continuation of the lease will repair any break in the terrace where it was crossed. Lessee shall not lay a line or maintain a drive through a waterway of terrace without written consent of the Lessor, which shall not be unreasonably withheld. Lessee will take no action nor permit any action, which will permanently alter the natural water drainage.

6. Lessee agrees to indemnify, defend, protect and shall save Lessor harmless of and from any and all clean up necessary to comply with any federal or state government regulations from spills or hazardous waste, and from any and all claims, demands, costs (including but not limited to attorney and expert fees), expenses, damages, losses, causes of actions or suits **for damages for injury to persons (including death) and injury or damage to or loss of any property or improvements _caused by the current operations_** upon the Leases Premises or Land pooled therewith by Lessees' exploration for oil and gas. This obligation of Lessee shall apply **regardless of cause or fault, including, without limitation, any negligent act or omission of Lessor, Lessor's representatives, agents or employees** even in event of transfer or assignment of lease.

7. Gas shut in provisions of the well or wells shall provide that after 90 days of cessation of production of gas, Lessee will pay $12.00 per year per net *mineral* acre payable by expiration of 90 day period, and the next annual payment shall be made one (1) year from the date of production cessation. Shut in period shall not exceed two (2) years.

8. Lessee shall have (6) months after the termination of the lease to remove all the Lessee's property, including casing. If, within six months after the termination of the lease, Lessee has not removed its property, it shall be presumed the Lessee has abandoned its property and it shall become property of the Lessor.

9. In the event a well is drilled on said premises and abandoned, Lessee or its assigned shall restore the premises back as close as possible to its original state before drilling operations or may pay the Lessor a sum to be mutually agreed upon and the Lessor shall thereupon perform the work himself.

10. . Lessee agrees that in the exploration operation they shall take into consideration any water wells now on the property and agrees to protect the purity of the water. Lessee shall leave casing in any well drilled from ground level to a minimum depth of 200 feet.

11. Lessee will not use surface water from the premises or water wells drilled on the premises without the written consent of the Lessor. Lessee agrees to purchase drilling and frac water from Lessor at the rate prevailing in the area of this lease, if Lessor has water available. Lessee shall have the right to drill water wells on the leased premises, utilize water out of said water wells free of charge. Upon abandonment of its operations on the leased premises, ownership and control of any water well and all casing associated with the said water well shall transfer to Lessor, as Lessor's option. Upon such transfer, Lessor shall assume all liability associated with the water well.

BOOK 0988 PAGE 0132

BOOK 0988 PAGE 0133

12. No well shall be used as a salt water disposal well without Lessor's prior written consent.

13. Lessee shall pay a minimum of $22.00 per rod for right of way and a minimum of $22.00 per rod for damages for the pipeline or electrical easement contained herein laid to a well-site on this lease. Lessor retains right to negotiate and control any easement or lease option for surface or underground access that is not **directly connected** to a well head for the purpose of oil and gas production on lease acres.

14. Lessee will bury pipelines, lateral and electrical lines below 3 feet in depth in a manner to offer the least amount of interference of farming operations, unless, by consultation with Lessor to the contrary, which shall be placed in writing to be valid.

15. It is understood and agreed that if this oil and gas lease is being maintained in force at the expiration of the primary term hereof, then operations or production from drilling and spacing unit embracing only a portion of the leased premises shall maintain this lease in force only as to those portions of the leased premises included in said drilling and spacing unit however, if at the end of the primary term, Lessee is then engaged in operations on the portion or portions of the leased premises not included in any sections or lands pooled or unitized therewith, or if Lessee has completed a well as a producer or a dry hole anywhere on the leased premises of lands pooled therewith within ninety (90) days prior to the expiration of the primary term, or any extension thereof, this lease shall remain in full force and effect as to all remaining leased premises not included in any such sections, only for so long as Lessee commences operations in accordance with conditions in main body of lease on any portion of the lease premises not included within such section within ninety (90) days of the completion of such well as a producer or a dry hole and conducts continuous operations thereon with no cessation of longer than ninety (90) days between the completion operations on a well and the commencement of operations for the next succeeding well.  At the expiration or termination of this lease, as to any part or all of the lease premises, by any of its provisions, Lessee shall promptly execute and deliver to Lessor or file of record in the public land office of the county and/or state in which the lease premises are located, a written release and surrender of this lease save and except that portion maintained by any provisions of this lease.  Those portions of the leased premises which are not included in said drilling and spacing unit and all rights lying below the stratigraphic equivalent of one hundred feet (100') below the base of the deepest producing formation in any well drilled on the leased premises shall be released by Lessee at that time. For purposes of this oil and gas lease, a drilling and spacing unit shall be defined as a drilling and spacing unit created by Order of the Kansas Corporation Commission of the State of Kansas, or if no drilling and spacing unit has been created by the Kansas Corporation Commission, a drilling and spacing unit shall be defined as a quarter of a section (i.e. 160 acres) for oil and a full section (i.e. 640 acres) for gas or any horizontal well.

16. Pooling shall not exceed 160 acres for oil and 640 acres for gas or any horizontal well.

BOOK 0988 PAGE 0133

17. Lessee agrees to forthwith furnish Lessor written notice of any application by Lessee or any other person of which Lessee has notice, seeking to establish or change spacing affecting the leased premises. Further, Lessee shall mail Lessor certified copy of voluntary unit declaration affecting leased acres.

18. If at the end of the primary term this lease is not otherwise continued in force under the provisions hereof, this lease shall expire, unless Lessee on or before the end of the primary term pays or tenders to Lessor, the sum of the original bonus per net mineral acre subject to this lease; and subject to the other provisions of this lease, the primary term shall be extended for an additional term as stated in the lease.

19. Lessee shall provide Lessor prior notice of Lessee's activities on the lease acres, **provide a copy** of this recorded lease, documents filed with regulatory authorities pertaining to drilling and production including drilling permits, completion reports and production reports, well logs, and well tests, and any other recorded documents associated with this lease including copies of assignments of interest in the lease.

20. By filing of the oil and gas lease and this exhibit attached, the Lessee accepts the terms as written and shall be binding upon Lessee and upon transferees, successor and assigns of this lease.

BOOK 0988 PAGE 0196

INDEXED ✓
DIRECT ✓
INDIRECT ✓
PHOTO ✓
COMPARED WITH ✓
COPY ✓

State of Kansas, Sumner County SS:
Filed for record on the 14th Day of
October, 2016 A.D. at 2:30
o'clock P.M and recorded in photo
Book 988 at page 196
fee's $81.00

Jessica D. Anderson

| | |
|---|---|
| **LESSOR** | Veda Dvorak, Trustee |
| **LESSEE** | Elk Energy Holdings, LLC |
| **TYPE OF DOCUMENT** | Oil Gas and Mineral Lease |
| **RECORDING FEES** | $81.00 |
| **TOTAL AMOUNT** | $81.00 |
| **RETURN ADDRESS** | Elk Energy Holdings, LLC |
| | 2250 N. Rock Rd., 118-107 |
| | Wichita, KS 67226 |

BOOK 0988 PAGE 0196



EXHIBIT
C

**Oil Gas and Mineral Lease**

BOOK 0 9 8 8 PAGE 0 1 9 7

AGREEMENT, Made and entered into the day of October 13, 2016, by and between, **VEDA DVORAK, Trustee**, whose mailing address is **11415 Hidden Lake Dr., APT # 805, Raytown, MO, 6413** hereinafter called Lessor(s) (whether one or more), and, **ELK ENERGY HOLDINGS, LLC**, whose address is, **2250 N Rock Rd, 118-107, Wichita, Kansas 67226**, hereinafter called Lessee:

Lessor, in consideration of **\*\*\*\* _Ten and More_ \*\*\*\*** Dollars (**$10.00**) in hand paid, receipt of which is here acknowledged and of the royalties herein provided and of the agreements of the lessee herein contained, hereby grants, leases and lets exclusively unto lessee for the purpose of investigating, exploring by geophysical and other means, prospecting drilling, mining and operating for and producing oil, liquid hydrocarbons, all gases, and their respective constituent products, injecting gas, water, other fluids, and air into subsurface strata, laying pipe lines, storing oil, building tanks, power stations, telephone lines, and other structures and things thereon to produce , save, take care of, treat, manufacture, process, store and transport said oil, liquid hydrocarbons, gases and their respective constituent products and other products manufactured therefrom, and housing and otherwise caring for its employees, the following described land, together with any reversionary rights and after-acquired interest, therein situated in **SUMNER** County, State of **KANSAS** described as follows to-wit:

### E/2, Section 8, Township 34 South, Range 03 West
Containing **374.50** acres, more or less, and all accretions thereto.

### See Exhibit "A" Additional Provisions

Subject to the provisions herein contained, this lease shall remain in force for a term of **ONE (1)** year from this date (called "primary term"), and as long thereafter as oil, liquid hydrocarbons, gas or other respective constituent products, or any of them, is produced from said land or land which said land is pooled.

In consideration of the premises the said lessee covenants and agrees:

1ᵗ. To deliver to the credit of the lessor, free of cost at the wellhead, and in the pipeline to which lessee may connect wells on said land, the equal ( **20 %**) part of all oil produced and saved from and on the leased premises.

2ⁿᵈ. To pay lessor for gas of whatsoever nature or kind produces and sold, or used off the premises, or used in the manufacture of any products there from,( **20 %**), at the market price at the well, (but, as to gas sold by lessee, in no event more than ( **20 %**) of the proceeds received by lessee from said sales), for the gas sold, used off the premises, or in the manufacture of products there from, said payments to be made monthly. Where gas from a well producing gas only is not sold or used, lessee may pay or tender as royalty Twelve Dollars ($12.00) per year per net mineral acre retained hereunder, for a period of TWO (2) years, and if such payment or tender is made it will be considered that gas is being produced within the meaning of the preceding paragraph.

This lease may be maintained during the primary term hereof without further payment or drilling operations. If lessee shall commence to drill a well within the term of this lease or any extension thereof, the lessee shall have the right to drill such well to completion with reasonable diligence and dispatch, and if oil or gas, or either of them, be found paying quantities, this lease shall continue and be in force like effect as if such well had been completed within the term of years first mentioned.

If said lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties herein provided for shall be paid the said lessor only in the proportion which the lessor's interest bears to the whole and undivided fee.

Lessee shall have the right to use, free of cost, gas, oil and water produced on said land for lessee's operations thereon, except water from the wells of lessor.

When requested by lessor, lessee shall bury lessee's pipe lines below plow depth.

No well shall be drilled nearer than 200 feet to the house or barn now on said premises without written consent of lessor.

Lessee shall pay for damages caused by lessee's operations to growing crops on said land.

Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing.

If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns, but no change in the ownership of the land or assignment of rentals or royalties shall be binding on the lessee until after the lessee has been furnished with a written transfer or assignment or a true copy thereof. In case lessee assigns this lease, in whole or in part, lessee shall be relieved of all obligations with respect to the assigned portions or portions arising subsequently to the date of assignment.

Lessee may at any time execute and deliver to lessor or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered.

All express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules or Regulations, and this lease shall not be terminated, in whole or in part, nor lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any such Law, Order, Rule or Regulation.

Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof with other land, lease or leases in the immediate vicinity thereof, when in lessee's judgment it is necessary or advisable to do so in order to properly develop and operate said lease premises so as to promote the conservation of oil, gas or other minerals in and under and that may be produced from said premises, such pooling to be of tracts contiguous to one another and to be into a unit or units not exceeding 160 acres each in the event

BOOK 0 9 8 8 PAGE 0 1 9 7

BOOK 0988 PAGE 0198

of an oil well, or into a unit or units not exceeding 640 acres each in the event of a gas well. Lessee shall execute in writing and record in the conveyance records of the county in which the land herein leased is situated an instrument identifying and describing the pooled acreage. The entire acreage so pooled into a tract or unit shall be treated, for all purposes except the payment of royalties on production from the pooled unit, as if it were included in this lease. If production is found on the pooled acreage, it shall be treated as if production is had from this lease, whether the well or wells be located on the premises covered by this lease or not. In lieu of the royalties elsewhere herein specified, lessor shall receive on production from a unit so pooled only such portion of the royalty stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein on an acreage basis bears to the total acreage so pooled in the particular unit involved.

Lessor hereby agrees to arrant and defend title to all lands and minerals, in and to same, in the event the minerals are not as represented by Lessor, the Lessor agrees to refund the bonus and rental or option monies paid by Lessee or its assigns, for the represented ownership by Lessor, upon demand.  Should the legal description of the lands herein need to be corrected for any reason, Lessor(s) hereby grant(s) unto Lessee the authority to do so, then to notifying Lessor of the changes, which may or may not affect the Lease money paid herewith.

IN WITNESS WHEREOF, the undersigned executed this instrument as of the day and year first above written. *This document may be executed in counterparts.*

Witnesses:

_Veda Dvorak, Trustee_
Veda Dvorak, Trustee

_____

STATE OF __Missouri__

COUNTY OF __Jackson__               ACKNOWLEDGEMENT FOR INDIVIDUAL

The foregoing instrument was acknowledged before me this __13th__ day of __October__ , 2016,

By __Veda Dvorak__ _____ as Trustee _____

My Commission expires __03/03/2019__      _Grace Armstrong_
                                                Notary Public

GRACE ARMSTRONG
Notary Public - Notary Seal
STATE OF MISSOURI
Jackson County
My Commission Expires: March 3, 2019
Commission # 15833662

BOOK 0988 PAGE 0198

BOOK 0988 PAGE 0199

Exhibit "A"

Attachment to Oil, Gas, and Mineral lease

ADDITIONAL PROVISIONS

1. Lessee agrees to pay to the Lessor minimum damages of $6,000.00 per well site location for vertical well, or $12,000.00 per horizontal well drilled per site location with one well bore per sight and $3,000.00 per additional well bore which shall be paid in advance of any work on location. Well site shall not exceed 2 (two) acres for vertical well or 3 (three) acres for horizontal well.

2. It is agreed between the Lessor and Lessee that notwithstanding any language herein, or in any division order to the contrary, all oil, gas, natural gas liquids, or other royalty accruing at the well head, "mouth of the well", to the Lessor under this lease or by state law shall be **without deduction** of all post production costs between well head and point of delivery of sale and for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas, gas liquids and other products produced hereunder to transform the product into marketable form. In no event shall Lessor receive a "market value" price that is less than, or more than, the price received by Lessee… as to all gas sold by Lessee under a written contract, the price received by Lessee for gas shall conclusively presumed to be the net proceeds at the well… for gas so sold. Lessor shall receive royalty share of any gas flared after Thirty (30) days accumulated production with price based on average daily market price for the month in which flaring takes place.

3. Lessee shall be required to keep the top-soil separate from the sub-soil and return the same as top-soil when the pits are leveled. Lessee further agrees that after drilling operations have been completed, Lessee will fill and level pits within a reasonable time after such pits have dried and cured. Prior to filling any pits containing a plastic liner, the liner will be removed or destroyed to such an extent that it will not interfere with the cultivation or the free penetration of water. Existing pit shall be filled and leveled within 90 days of lease signing, *unless being used by lease.* Drill sight will be reduced to minimum required for production operations after completion. Sight will not be used for storage of nonproduction equipment or buildings, or for any purpose other than oil or gas production. Trash and debris will be removed within 24 hours from location upon completion of any activities on site.

4. Lessee will keep weeds and noxious weeds free and clear around production equipment and keep weeds free and clear from pumping units and tank batteries and if located in pasture-land will fence the area around such equipment and use cattle guards rather than gates. All anchors used in drilling and work over rigs are to be marked plainly with T-posts and reflective covers so as to be visible when working the land. Lessee will correct any breech of this condition within a week of notification by Lessor.

BOOK 0988 PAGE 0199

BOOK 0 9 8 8 PAGE 0 2 0 0

5.  If Lessee crosses any terrace or fence, Lessee shall restore such terrace or fence to its original condition, as nearly as practical, and during the continuation of the lease will repair any break in the terrace where it was crossed. Lessee shall not lay a line or maintain a drive through a waterway of terrace without written consent of the Lessor, which shall not be unreasonably withheld. Lessee will take no action nor permit any action, which will permanently alter the natural water drainage.

6.  Lessee agrees to indemnify, defend, protect and shall save Lessor harmless of and from any and all clean up necessary to comply with any federal or state government regulations from spills or hazardous waste, and from any and all claims, demands, costs (including but not limited to attorney and expert fees), expenses, damages, losses, causes of actions or suits **for damages for injury to persons (including death) and injury or damage to or loss of any property or improvements _caused by the current operations_** upon the Leases Premises or Land pooled therewith by Lessees' exploration for oil and gas. This obligation of Lessee shall apply **regardless of cause or fault, including, without limitation, any negligent act or omission of Lessor, Lessor's representatives, agents or employees** even in event of transfer or assignment of lease.

7.  Gas shut in provisions of the well or wells shall provide that after 90 days of cessation of production of gas, Lessee will pay $12.00 per year per net _mineral_ acre payable by expiration of 90 day period, and the next annual payment shall be made one (1) year from the date of production cessation. Shut in period shall not exceed two (2) years.

8.  Lessee shall have (6) months after the termination of the lease to remove all the Lessee's property, including casing. If, within six months after the termination of the lease, Lessee has not removed its property, it shall be presumed the Lessee has abandoned its property and it shall become property of the Lessor.

9.  In the event a well is drilled on said premises and abandoned, Lessee or its assigned shall restore the premises back as close as possible to its original state before drilling operations or may pay the Lessor a sum to be mutually agreed upon and the Lessor shall thereupon perform the work himself.

10. . Lessee agrees that in the exploration operation they shall take into consideration any water wells now on the property and agrees to protect the purity of the water. Lessee shall leave casing in any well drilled from ground level to a minimum depth of 200 feet.

11. Lessee will not use surface water from the premises or water wells drilled on the premises without the written consent of the Lessor. Lessee agrees to purchase drilling and frac water from Lessor at the rate prevailing in the area of this lease, if Lessor has water available. Lessee shall have the right to drill water wells on the leased premises, utilize water out of said water wells free of charge. Upon abandonment of its operations on the leased premises, ownership and control of any water well and all casing associated with the said water well shall transfer to Lessor, as Lessor's option. Upon such transfer, Lessor shall assume all liability associated with the water well.

BOOK 0 9 8 8 PAGE 0 2 0 0

BOOK **0988** PAGE **0201**

12. No well shall be used as a salt water disposal well without Lessor's prior written consent.

13. Lessee shall pay a minimum of $22.00 per rod for right of way and a minimum of $22.00 per rod for damages for the pipeline or electrical easement contained herein laid to a well-site on this lease. Lessor retains right to negotiate and control any easement or lease option for surface or underground access that is not **directly connected** to a well head for the purpose of oil and gas production on lease acres.

14. Lessee will bury pipelines, lateral and electrical lines below 3 feet in depth in a manner to offer the least amount of interference of farming operations, unless, by consultation with Lessor to the contrary, which shall be placed in writing to be valid.

15. It is understood and agreed that if this oil and gas lease is being maintained in force at the expiration of the primary term hereof, then operations or production from drilling and spacing unit embracing only a portion of the leased premises shall maintain this lease in force only as to those portions of the leased premises included in said drilling and spacing unit however, if at the end of the primary term, Lessee is then engaged in operations on the portion or portions of the leased premises not included in any sections or lands pooled or unitized therewith, or if Lessee has completed a well as a producer or a dry hole anywhere on the leased premises of lands pooled therewith within ninety (90) days prior to the expiration of the primary term, or any extension thereof, this lease shall remain in full force and effect as to all remaining leased premises not included in any such sections, only for so long as Lessee commences operations in accordance with conditions in main body of lease on any portion of the lease premises not included within such section within ninety (90) days of the completion of such well as a producer or a dry hole and conducts continuous operations thereon with no cessation of longer than ninety (90) days between the completion operations on a well and the commencement of operations for the next succeeding well.  At the expiration or termination of this lease, as to any part or all of the lease premises, by any of its provisions, Lessee shall promptly execute and deliver to Lessor or file of record in the public land office of the county and/or state in which the lease premises are located, a written release and surrender of this lease save and except that portion maintained by any provisions of this lease.  Those portions of the leased premises which are not included in said drilling and spacing unit and all rights lying below the stratigraphic equivalent of one hundred feet (100') below the base of the deepest producing formation in any well drilled on the leased premises shall be released by Lessee at that time. For purposes of this oil and gas lease, a drilling and spacing unit shall be defined as a drilling and spacing unit created by Order of the Kansas Corporation Commission of the State of Kansas, or if no drilling and spacing unit has been created by the Kansas Corporation Commission, a drilling and spacing unit shall be defined as a quarter of a section (i.e. 160 acres) for oil and a full section (i.e. 640 acres) for gas or any horizontal well.

16. Pooling shall not exceed 160 acres for oil and 640 acres for gas or any horizontal well.

BOOK **0988** PAGE **0201**

BOOK 0988 PAGE 0202

17. Lessee agrees to forthwith furnish Lessor written notice of any application by Lessee or any other person of which Lessee has notice, seeking to establish or change spacing affecting the leased premises.  Further, Lessee shall mail Lessor certified copy of voluntary unit declaration affecting leased acres.

18. If at the end of the primary term this lease is not otherwise continued in force under the provisions hereof, this lease shall expire, unless Lessee on or before the end of the primary term pays or tenders to Lessor, the sum of the original bonus per net mineral acre subject to this lease; and subject to the other provisions of this lease, the primary term shall be extended for an additional term as stated in the lease.

19. Lessee shall provide Lessor prior notice of Lessee's activities on the lease acres, **provide a copy** of this recorded lease, documents filed with regulatory authorities pertaining to drilling and production including drilling permits, completion reports and production reports, well logs, and well tests, and any other recorded documents associated with this lease including copies of assignments of interest in the lease.

20. By filing of the oil and gas lease and this exhibit attached, the Lessee accepts the terms as written and shall be binding upon Lessee and upon transferees, successor and assigns of this lease.

BOOK 0988 PAGE 0202

## AFFIDAVIT OF PRODUCTION

BOOK **1029** PAGE **0087**

I, Thomas Knowles, of lawful age, being first duly sworn upon oath deposes and says that Affiant has personal knowledge of the facts hereinafter set forth with respect to the following described oil and gas lease, to-wit:

Oil and Gas Lease dated October 11th 2016, entered into by and between James A. and Vonette Buresh (Husband and Wife), as Lessor(s), and Elk Energy Holdings, LLC., as Lessee(s), said oil and gas lease being recorded in Book 988 at Page 129 of the Register of Deeds Office of Sumner County, Kansas, covering the therein described real property.

**Township 34 S Range 03 W:**

Section 17: N2

That public notice is hereby given under K.S.A. 55-205, that Affiant is an owner and/or operator of the above described lease as hereinbefore set forth; that a well ("Buresh 17-1HM") capable of producing oil and/or gas in paying quantities has been completed upon the above described real property within the primary term of said oil and gas lease(s); that Affiant is now in possession of the above described land and is entitled by the terms of said lease and the above mentioned agreement to continue in possession, and in operation, of said well and said lease as long as oil or gas is produced from the above described land.

ELK ENERGY HOLDINGS, LLC

By: _____

Thomas Knowles, CEO

INDEXED _____
DIRECT _____
INDIRECT _____
PHOTO _____
COMPARED WITH
COPY _____

STATE OF _Kansas_

ACKNOWLEDGEMENT FOR INDIVIDUALS

COUNTY OF _Sedgwick_

The foregoing instrument was acknowledged before me this _29th_ day of _August_

_2018_, By _Thomas Knowles_

My Commission expires

_Rebecca E Hayes_

Notary Public

REBECCA E. HAYES
NOTARY PUBLIC
STATE OF KANSAS
My App. Exp. 07/28/2021

State of Kansas, Sumner County SS:
Filed for record on the ___ day of _____ 20__ A.D. at _____
o'clock ___ M and recorded in photo
Book _1029_ at page _____
fee $_____
_Jessica D. Anderson_

BOOK **1029** PAGE **0087**

RETURN: Elk Energy LLC, 2250 N Rock Rd, Ste 118-107, Wichita, KS 67226

EXHIBIT
A



BOOK 1086 PAGE 0442

State of Kansas, Sumner County SS:
Filed for record on the 25th Day of
_____, 20 21 A.D. at _____
o'clock ___ M and recorded in photo
Book _____ at page _____
fees $ _____
_____
Jessica O. Anderson

INDEXED
DIRECT
INDIRECT
PLAT
COMPUTER
COPY

# DOCUMENT COVER SHEET
*This is the first page of this document - Do Not Remove*

**LESSOR:**        Veda Dvorak, Trustee of the Veda M. Dvorak Trust dated 12/08/1998

**LESSEE:**        Elk Energy Holdings, LLC

**TYPE OF DOCUMENT:**   Salt Water Disposal Agreement

**NUMBER OF PAGES**
**(including cover sheet):** 5

**RETURN ADDRESS:**    Bauer, Pike, Bauer, Wary & Carroll, LLC
PO Box 1349
1310 Kansas
Great Bend, KS  67530

BOOK 1086 PAGE 0442



EXHIBIT
E

BOOK 1086 PAGE 0443

## SALT WATER DISPOSAL AGREEMENT

This Salt Water disposal agreement is made and entered into on this 18th day of February, 2021, by and between Veda Dvorak, Trustee of the Veda M. Dvorak Trust dated 12/08/1998, (hereinafter referred to as "Lessor"); and Elk Energy Holdings, LLC, (hereinafter referred to as "Lessee").

1. Lessor owns the following described real property situated in Sumner County, Kansas, to-wit:

> The East Half (E/2) of Section Eight (8), Township Thirty-Four South (34S), Range Three (3) West, Sumner County, Kansas.

2. Lessee has an oil and gas lease dated October 14, 2016, recorded at Book 0988 Page 0196 in the office of the Sumner County Register of Deeds, covering the following described real property situated in Sumner County, Kansas, to-wit:

> The North Half (N/2) of Section Seventeen (17), Township Thirty-Four South (34S),
>
> Range Three (3) West, Sumner County, Kansas, known as Buresh 17-1HM, Well API: 15-191-22715-0100. (Buresh)

3. Lessor and Lessee agree that Lessee may drill one salt water disposal / injection well on the above-described real property owned by Lessor at a site to be mutually agreed upon prior to drilling commencing thereon, which disposal well shall be utilized exclusively for the disposal or injection of the above referenced "Buresh" well and for no other purpose. It is highly important to Lessor where the drill site and access to the same is located, Exhibit "1" attached hereto and incorporated herein depicts where that site is to be located, and where the access road is to be located. Lessee will have the right to access operate, maintain, repair, and replacement of said well and lines thereto. All pipelines shall be laid below plow depth and shall in no way interfere with the use by the Lessor, and Lessor's tenants to surface use of the property. No activity hereunder by Lessee is allowed to harm any sub-surface fresh water supplies of Lessor's property.

4. Lessee shall comply with all Federal, State, and County, laws and regulations in its operations permitted hereunder, including, but not limited to those of the Kansas Corporation Commission. Additionally, Lessee shall at all times conduct its operations in an orderly manner and shall be good stewards of the Lessor's real property being leased hereunder. Specifically, Lessee will at all times keep the real property free of trash; debris; unused equipment including pipe; and free of overgrowth of vegetation. Lessee shall also assure, that in the event any activities allowed hereunder cause disturbance to the surface of Lessor's real property that said surface will be immediately returned to as good condition as it was before those activities. Lessee shall pay all reasonable crop damages to Lessor and Lessor's tenant/s created by Lessee's activities hereunder. Lessee shall assure that the surface is not allowed to be in a rutted condition nor will it allow any of its operations hereunder to change the natural flow / drainage of surface waters. In the event Lessee does not fully comply with the requirements of this paragraph within thirty (30) days of written notice of non-compliance by Lessor, at Lessee's last known address, Lessee will be liable for all reasonable attorney's fees and expenses incurred by Lessor in compelling Lessee's compliance.

1

BOOK 1086 PAGE 0443

BOOK 1086 PAGE 0444

5.    Lessee shall maintain a policy of insurance in a sum of not less than $2,000,000.00 dollars which covers all claims that may arise from Lessee's use of the Lessor's real property, both as it relates to claims/potential claims by Lessor and third-party claims.  Lessee shall provide a copy of said certificate of insurance to Lessor on or before January 15 of each year this Agreement remains in place.

6.    Lessee shall indemnify and hold Lessor harmless, including the reasonable fees incurred by Lessor, from any and all third-party claims of any nature or type, including but not limited to, governmental claims, and including but not limited to, alleged damages to person or property, as a result of Lessee's use of Lessor's property.

7.    This lease term shall be for an initial period of five (5) years from the date of this Agreement.   It may be extended by Lessee upon written notice of Lessee's intent to renew the same not less than six (6) months prior to expiration of that lease term.  If this Lease is renewed by the Lessee, then the new lease payment due thereunder shall automatically increase at the rate of fifteen percent (15%) from the lease payment due under the most recent lease term.   Lessee may terminate this Agreement in Lessee's sole discretion with thirty (30) days written notice to Lessor.  If this Agreement is terminated by Lessee prior to the end of a lease term, Lessee shall be responsible for payment in full of the calendar year lease payments due by Lessee to Lessor regardless of the month of termination by Lessee.   Upon termination of this Agreement, whether at the end of a lease term, or as a result of early termination by Lessee, the parties agree that an essential term of this Agreement is that Lessee shall no later than ninety (90) days after termination remove all above and below ground equipment; lines; ancillary well site items; and structures that it caused to be on Lessor's real property, and it shall leave the Lessor's property in as good of condition as it was before this Agreement was entered into by the parties.  In the event Lessee does not fully comply with the requirements of this paragraph within thirty (30) days of written notice of non-compliance by Lessor, at Lessee's last known address, Lessee will be liable for all reasonable attorney's fees and expenses incurred by Lessor in compelling Lessee's compliance.

8.    Lessee shall pay to Lessor the sum of annual sum of $1,500.00 due March
 and December 1of each year which this Agreement is in place.  Failure to pay the required sums within fifteen (15) days of the due date thereof shall constitute automatic default by Lessee and Lessor is under no obligation whatsoever to notify Lessee of said default, and this Agreement shall be automatically terminated and those provisions in paragraph 7 above as to post-termination requirements of the Lessee shall fully apply.   In the event Lessee does not fully comply with the requirements of this paragraph within thirty (30) days of written notice of non-compliance by Lessor, at Lessee's last known address, Lessee will be liable for all reasonable attorney's fees and expenses incurred by Lessor in compelling Lessee's compliance.

9.    Lessee shall at its sole expense fence off its disposal well and ancillary equipment thereto in a manner which is protective of livestock, Lessee shall at its expense maintain said fence.

10.    This Agreement shall be binding upon the successor, assigns, executors, trustees, heirs and beneficiaries of the parties hereto.

2

BOOK 1086 PAGE 0444

BOOK 1086 PAGE 0445

This Agreement represents the full and complete understanding of the parties.

By: _Veda M. Dvorak Trustee_
Veda Dvorak, Trustee of the Veda M. Dvorak Trust
dated 12/08/1998,


STATE OF _Missouri_, COUNTY OF _Jackson_ SS:


BE IT REMEMBERED, that on this 18th day of _February_ 2021, before me, a Notary Public, in and for the State and County aforesaid, came Veda Dvorak, Trustee of the Veda M. Dvorak Trust dated 12/08/1998, known to me to be the same person who executed the foregoing Salt Water Disposal Agreement and duly acknowledged the execution of the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year last above written.

> GRACE ARMSTRONG
> Notary Public – Notary Seal
> STATE OF MISSOURI
> Comm. Number 15633662
> Jackson County
> My Commission Expires: Mar. 3, 2023

_Grace Armstrong_
Notary Public


By: _[signature]_
For, Elk Energy Holdings, LLC,


STATE OF _Kansas_, COUNTY OF _Sedgwick_ SS:


BE IT REMEMBERED, that on this 2nd day of _March_ 2021, before me, a Notary Public, in and for the State and County aforesaid, came _Thomas C. Knowles_, _CEO_ of Elk Energy Holdings, known to me to be the same person who executed the foregoing Salt Water Disposal Agreement and duly acknowledged the execution of the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year last above written.

> NOTARY PUBLIC
> STATE OF KANSAS
> REBECCA E. HAYES
> NOTARY PUBLIC
> STATE OF KANSAS
> My App. Exp. 01/28/2021

_Rebecca E. Hayes_
Notary Public

3

BOOK 1086 PAGE 0445

Exhibit "L"

S Ryan Rd

S Ryan Rd

BOOK 1086 PAGE 0446

North